UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
NATIONWIDE CATV AUDITING SERVICES, INC.,

               Plaintiff,

        -against-

CABLEVISION SYSTEMS CORPORATION,
CSC HOLDINGS, INC., CSC HOLDINGS, LLC,

               Defendants.
--------------------------------------------------------------------X

**OPINION AND ORDER**
**12-CV-3648 (SJF)(ETB)**

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  MAY 07 2013  ★

LONG ISLAND OFFICE

FEUERSTEIN, J.

On July 24, 2012, plaintiff Nationwide CATV Auditing Services, Inc. ("plaintiff" or "Nationwide") commenced this action against Cablevision Systems Corporation, CSC Holdings, Inc., CSC Holdings, LLC (collectively, "defendants" or "Cablevision"), asserting claims for: (1) breach of contract; (2) unfair and deceptive trade practices; (3) unfair competition; (4) violation of the Lanham Act, 15 U.S.C. § 1051 et seq.; (5) negligence; (6) breach of fiduciary duty; (7) unjust enrichment; (8) civil conspiracy; and (9) prima facie tort. [Docket Entry No. 1] ("Compl."). Plaintiff requests: (1) injunctive relief, including (a) an accounting, (b) disgorgement of profits, and (c) reinstatement; (2) compensatory damages, including for "loss of goodwill in excess of $3.5 million"; (3) treble damages; (4) punitive damages; and (5) attorney's fees and costs. Compl. at 34. Now before the Court is Cablevision's motion to dismiss certain of Nationwide's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Docket Entry No. 13] (the "motion"). For the reasons that follow, the motion is GRANTED.

1

I.    Background

Cablevision operates cable television systems, and Nationwide provides "installation and maintenance services to consumers on behalf of cable providers." Compl. at ¶¶ 6-8. Nationwide provided services to Cablevision pursuant to a Standard Installation and Services Agreement (the "2006 Agreement"), including "all work necessary to install, service, repair or remove as requested Cablevision's broadband telecommunications system . . . within single family residences, multiple dwelling units, and/or commercial buildings including business establishments and, if requested, to install, service, repair or remove aerial and underground plant to such premises" (the "Contract Work"). Compl. at ¶¶ 26-28, 38. Nationwide agreed to several subsequent modifications of the 2006 Agreement and entered a modified Standard Installation and Services Agreement in November 2011 (the "2011 Agreement," and together with the 2006 Agreement, the "Agreements"), which governed the relationship between the parties until January 2012. Compl. at ¶¶ 29-36.[1]

The Agreements required Nationwide to "conduct a pre-employment Inquiry and Screening for each individual retained or employed by Nationwide" and provide that Nationwide may not "permit any individual to perform [Contract] Work . . . unless the Inquiry results are acceptable pursuant to th[e] Agreement[s], taking into consideration Cablevision's legitimate interest in protecting property, and the safety and welfare of Cablevision's customers, employees and the general public." Compl. at ¶ 44. For each retained employee, Nationwide was required to "complete and file with Cablevision a Pre-Placement/Vehicle Identification Form . . . documenting that the Screening and Inquiry [were] conducted and [were] in full compliance

---

[1]    Cablevision maintains that Nationwide never executed the 2011 Agreement. However, as discussed in further detail below, Cablevision has stipulated to its execution for purposes of this motion, and the relevant provisions of the 2006 and 2011 Agreements are substantively identical.

in accordance with the terms of th[e] Agreement[s]." Compl. at ¶ 41.

In April 2011, Nationwide received an employment application from Francisco Sanchez, conducted a screening and, "[f]inding nothing in Sanchez's background to raise any concerns, . . . accepted his application for employment and assigned him to perform [Contract] Work pursuant to the Agreement, using the "Optimum Cable" badge, uniform and vehicle signage required by Cablevision." Compl. at ¶¶ 46-48.[2] In July 2011, law enforcement investigated a report by a Cablevision customer that Sanchez had stolen jewelry from the customer's home while performing work on behalf of Cablevision (the "July 2011 burglary"). Compl. at ¶ 49. Nationwide notified Cablevision of the investigation, stopped Sanchez from performing further Contract Work, and performed a second background check, which "again raised no concerns." Compl. at ¶¶ 50-51. "Following discussions between authorized representatives of Cablevision and Nationwide, Cablevision agreed that Sanchez was acceptable to Cablevision to continue to perform [Contract] Work under the 2011 . . . Agreement, despite the customer's allegations." Compl. at ¶ 52.

In December 2011 and January 2012, Nationwide "significantly" increased its workforce and purchased additional vehicles in response to Cablevision's promise to provide additional Contract Work in connection with Cablevision's conversion of its customers' equipment from analog to digital, and Cablevision "did in fact increase the volume of [Contract] Work assigned to Nationwide." Compl. at ¶¶ 41-42. However, on January 28, 2012, police responded to a reported burglary in East Patchogue, New York and pulled over a van with "Optimum Cable" signs on the doors, which was occupied by Sanchez and two (2) other individuals. Compl. at

---

[2]  According to Nationwide, the Agreements required Nationwide employees performing Contract Work to wear uniforms and use vehicles featuring Cablevision's "Optimum Cable" service mark, with no reference to Nationwide. Compl. at ¶ 39.

3

¶ 53. "According to news media reports, Sanchez and his alleged accomplices were arrested and charged with 2nd Degree Burglary in connection with the East Patchogue burglary, as well as six other burglaries in neighboring communities in September, December and January 2012[, and] Sanchez was also charged in connection with the July 2011 burglary." Compl. at ¶ 54. Various media reports identified Sanchez as an employee of Nationwide. Compl. at ¶¶ 55-56.

Nationwide alleges that Cablevision, "[i]n a deliberate, malicious effort to deceive consumers into concluding that Nationwide, but not Cablevision was somehow responsible for Sanchez' [sic] criminal conduct, . . . publicly announced that it was 'immediately suspending work with the Nationwide subcontracting company, which provides a limited amount of work, only in Suffolk County, NY, pending a complete and thorough investigation" (the "Statement"). Compl. at ¶ 57. According to Nationwide, the Statement failed to disclose that: (1) Cablevision "specifically authorized Nationwide to permit Sanchez to return to work after Sanchez had been accused of [the July 2011 burglary]"; (2) Nationwide was Cablevision's "top performing contractor, according to Cablevision's own metrics"; and (3) Cablevision's employees, not Nationwide's, had "serviced some of the . . . customers who had allegedly been burglarized." Compl. at ¶ 58.

Nationwide subsequently provided Cablevision with its "confidential and proprietary Inquiry and Screening materials for Sanchez and each of Nationwide's other employees . . . ." Compl. at ¶ 59. Following Cablevision's review of the materials provided, "authorized representatives of Cablevision . . . assured Nationwide's President that Cablevision's investigation had confirmed that Nationwide had done nothing wrong with respect to Sanchez and had no more ability than Cablevision to have anticipated or prevented Sanchez' [sic] alleged crimes," and that Cablevision's own background check on Sanchez had failed to uncover any

4

relevant information. Compl. at ¶¶ 60-61. Representatives of Cablevision nonetheless informed Nationwide's President that "they had been instructed to terminate Nationwide's contract as a public relations strategy intended to provide Cablevision's customers with false and misleading reassurance by implying" (1) that Nationwide, not Cablevision, should have "anticipated and prevented Sanchez's crimes" and (2) that the "risk of future burglaries of Cablevision customers had been mitigated by the termination of Nationwide." Compl. at ¶ 62. With the exception of the July 2011 burglary, "none of the burglaries involved customers serviced by Nationwide, and all of them therefore involved customers serviced by Cablevision's own employees and/or employees of other Cablevision contractors." Compl. at ¶ 67.

Representatives of Cablevision and AWS Broadband and Fiber ("AWS"), one of Nationwide's competitors, later contacted Nationwide's President and told him that "all of Nationwide's installation technicians were eligible to be rehired by AWS and other cable contractors to perform work for Cablevision, with the exception of 'one or two' whose Preplacement Screening and Inquiry information was allegedly 'inadequate.'" Compl. at ¶¶ 68-70. Cablevision "and/or" AWS "conspired and colluded to misappropriate the confidential and proprietary information Nationwide provided to Cablevision regarding Nationwide's employees, and used that information to contact . . . [the] employees to induce them to leave Nationwide's employ and work for Cablevision and/or AWS," telling the employees that Nationwide "is no more" and that they would only be able to continue to perform work for Cablevision if they accepted employment with AWS. Compl. at ¶¶ 72-73.

On February 9, 2012, Nationwide received a notification, postmarked February 6, 2012, that Cablevision was terminating the 2006 Agreement as of February 10, 2012 "due to Nationwide's failure to conduct adequate background checks on its employees, as well as its

5

failure to provide Certifications as required under the terms of the Agreement." Compl. at ¶ 75.[3] Nationwide alleges that these grounds for termination were "false and pretextual" and that Cablevision was engaged in a "scheme to mislead and deceive consumers by creating the false impression that terminating Nationwide's contract would protect consumers against future criminal acts by Cablevision installers" and to "misappropriate Nationwide's good will, assets, and workforce for the benefit of Cablevision and/or . . . AWS." Compl. at ¶ 78.

On February 14, 2012, Nationwide collected Cablevision's equipment in its possession and delivered it to AWS, as instructed by Cablevision. Compl. at ¶ 82. Nationwide "made a cursory count" of the equipment because it "assum[ed] that Cablevision's 'equipment charges' were up to date on the most recent credit memos received from Cablevision." Compl. at ¶ 82. Cablevision initially withheld two hundred sixty-one thousand dollars ($261,000.00) in remittances owed to Nationwide for Contract Work performed "pending reconciliation of assets, issuance of any credit memos for the month of January, exception processing, and 'possible litigation.'" Compl. at ¶¶ 83, 92. Cablevision later turned over one hundred fifty-four thousand eight hundred sixty-seven dollars and forty-seven cents ($154,867.47), leaving an outstanding balance owed to Nationwide of one hundred six thousand one hundred thirty-three dollars ($106,133.00). Compl. at ¶ 83.

Nationwide alleges that Cablevision's withholding of the remittances violated the terms of the Agreements and was a "deliberate and malicious effort to further damage" Nationwide. Compl. at ¶¶ 83-92. Nationwide also alleges that the credits for "equipment charges" assessed against the remittances owed were revealed to relate to equipment either already returned by Nationwide or in the possession of Cablevision's customers. Compl. at ¶¶ 94-96. According to

---

[3]     Cablevision failed to provide five (5) days' notice as required by the Agreements. Compl. at ¶ 76.

Nationwide, Cablevision "took these credits based on its own [equipment] tracking system which it represented to plaintiff to be accurate, but which failed to track equipment installed by Nationwide for Cablevision customers, for which Cablevision . . . charged and received payment from its customers." Compl. at ¶ 101. Nationwide alleges that Cablevision's conduct constituted a "'double dipping'" scheme "by which it charge[d] its customer and its installation contractor for the same item of equipment, and conceal[ed] the double-charging from both parties, who have reasonably relied upon the accuracy of invoices and credit memos which Cablevision kn[ew] to be inaccurate and misleading." Compl. at ¶¶ 101-02, 105. Nationwide alleges, "[o]n information and belief," that Cablevision "helped [themselves] to credits for fraudulent equipment charges to plaintiff totaling over $250,000 in 2006 through January 31, 2012, which Nationwide did not and does not owe." Compl. at ¶ 106.

II.    Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)." Twombly, 550 U.S. at 555. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See McGarry v. Pallito, 687 F.3d 505, 510 (2d Cir. 2012); Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679; see also Ruston v. Town Board for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) ("A court can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.") (quotations and citations omitted). Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120-1 (2d Cir. 2010); see also Matson v. Board of Education of City School District of New York, 631 F.3d 57, 63 (2d Cir. 2011) ("While a complaint need not contain detailed factual allegations, it requires more than an unadorned, the defendant-unlawfully-harmed-me accusation.") (internal quotations and citation omitted).

The Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (citing International

8

Audiotext Network, Inc. v. American Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)).

III.     Analysis

    A.     Breach of Contract

Nationwide asserts a breach of contract claim for Cablevision's: (1) termination of the 2011 Agreement "based upon false and pretextual grounds"; (2) "breach of its promise, in December and January 2011-2012 to provide more work to Nationwide in exchange for Nationwide increasing its work force and purchasing more vehicles"; (3) "fraudulent equipment charges, which resulted in Nationwide and Cablevision's customers each being charged separately for the same item of equipment"; and (4) withholding of remittances owed to Nationwide [] for [Contract] Work performed." [Docket Entry No. 13-5] ("Pl. Memo.") at 4-5; Compl. at ¶¶ 41-42, 83, 100-06.

Nationwide argues that Cablevision's motion to dismiss the breach of contract claim should be denied in its entirety because it relies upon the 2006 Agreement, which Nationwide alleges "was superseded by the 2011 [Agreement]," and Cablevision has failed to "provid[e] any evidence to substantiate the assertion[] that the terms of the 2011 Agreement, 'as relevant to this action, are materially the same as the terms of the [2006] Agreement.'" Pl. Memo. at 2-3. In fact, Cablevision has stipulated for purposes of this motion that the 2011 Agreement was executed, see [Docket Entry No. 13-1] ("Def. Memo.") at 2 n.1, and a review of the 2011 Agreement demonstrates that it is substantively identical to the 2006 Agreement in all respects material to this case.[4] Therefore, whether the 2011 Agreement was executed does not constitute

---

[4]     In support of its argument that the execution of the 2011 Agreement is material, Nationwide attached to its response to the motion a single page from the 2011 Agreement, showing that section 25 of the document is titled "Cablevision's Right to Audit," not "Termination," as it is titled in the 2006 Agreement. See Pl. Memo. at 3; Declaration of Stephen D. Ellis, Ex. A. However, Cablevision submitted the entire 2011 Agreement with their reply in

a disputed issue of material fact sufficient to defeat Cablevision's motion.[5]

### 1. Termination

The Agreements provide that "upon five (5) days prior written notice, [Cablevision] may terminate th[e] Agreement, in whole or in part, when it is in the interest of Cablevision." 2006 Agreement § 25(a)(2); 2011 Agreement § 26(a)(2). Cablevision argues that "the plain terms of the Agreement make clear that Nationwide has no claim for breach," since (1) "the Agreement gives Cablevision the absolute right to terminate the Agreement on five days written notice," (2) Cablevision's right to terminate the Agreement was unconditional, and (3) Nationwide has failed to allege that Cablevision's failure to comply with the five (5) days' notice requirement was the proximate cause of damages to Nationwide. Def. Memo. at 6-7. Nationwide asserts that "Cablevision did <u>not</u> purport to terminate the 2006 Agreement 'in the interests of Cablevision'' pursuant to [section] 25(a)(2)," but rather terminated it "due to [Nationwide's] failure to conduct adequate background checks on its employees, as well as its failure to provide Certifications as required under the terms of the Agreement," and that this basis for termination is a "pretext," and "constitutes a breach of the express terms of the 2011 Agreement . . . ." Pl. Memo. at 4.

---

support of the motion, and it is clear that the relevant provisions of the 2011 Agreement are substantively identical to those in the 2006 Agreement. The Court does not appreciate plaintiff's disingenuous attempt to create the appearance of a material difference between the Agreements.

[5]  Cablevision submitted an unexecuted version of the Standard Installation and Services Agreement that it used with its contractors in November 2011. Although Nationwide asserts that a version of this agreement was executed, it has not submitted it to the Court, and there is no reason for the Court to believe that the executed version (if it exists) is substantively different from the version submitted by Cablevision. Nationwide relies upon the provisions of both the 2006 and 2011 Agreements throughout its complaint, and therefore both may be considered by the Court. See Chambers, 282 F.3d at 152-53 ("[T]he complaint is deemed to include any . . . documents incorporated in it by reference[, and e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotation marks and citations omitted).

"'A party has an absolute, unqualified right to terminate a contract on notice pursuant to an unconditional termination clause without court inquiry into whether the termination was activated by an ulterior motive.'" Red Apple Child Dev. Ctr. v. Cmty. Sch. Dists. Two, 756 N.Y.S.2d 527, 529 (App. Div. 2003) (quoting Big Apple Car. v. City of N.Y., 611 N.Y.S.2d 533, 534 (App. Div. 1994)). The clause allowing termination "in the interest of Cablevision" is such an unconditional termination clause, and therefore Cablevision's stated reason for terminating the Agreement and whether that reason was pretextual is irrelevant and cannot support a breach of contract claim. Furthermore, Nationwide does not dispute that the complaint fails to allege prejudice or damages caused by Cablevision having provided four (4) days' notice of termination rather than five (5). Accordingly, Nationwide's breach of contract claim is dismissed insofar as it is based upon the termination of the Agreements.[6]

        2.      Promise to Provide Additional Contract Work

According to Cablevision, Nationwide's breach of contract claim related to Cablevision's alleged promise in "December and January 2011-2012 to provide more work to Nationwide in exchange for Nationwide increasing its work force and purchasing more vehicles," Pl. Memo. at 5, must be dismissed because: (1) the Agreements provide that Nationwide "agrees and understands that Cablevision makes no guarantee . . . to provide [Nationwide] with any certain amount of [Contract] Work," Agreements § 5(g), and contain an integration clause stating that the agreement "constitutes the entire understanding between the parties . . . [and] cannot be

---

[6]      According to Nationwide, "Cablevision's letter of February 3, 2012 only purported to terminate the 2006 agreement, which, according to the Verified Complaint, was no longer operative, having been superseded by the 2011 Agreement," and "[d]efendants do not appear to contend that they ever attempted or purported to terminate the operative 2011 Agreement." Pl. Memo. at 3. The issue is irrelevant, since it is clear that Cablevision intended to terminate the agreement governing the parties' relationship and, as discussed above, the Agreements are substantively identical with respect to the issues presented in this case.

changed . . . except by a writing signed by an officer of each party hereto," 2006 Agreement § 31; 2011 Agreement § 32; and (2) the complaint itself contradicts the basis of the claim, alleging that "Cablevision did in fact increase the volume of [Contract] Work assigned to Nationwide," Compl. at ¶ 42. Nationwide argues that "even if Cablevision was not obligated under the 2011 Agreement to provide 'any specific amount of work' . . . , this does not necessarily mean that Cablevision had the right to provide Nationwide with no work at all, especially given the allegations that Cablevision deliberately induced Nationwide to increase its work force and purchase multiple vehicles." Pl. Memo. at 7.

"According to well-established rules of contract interpretation, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms," and this rule is applied "with even greater force in commercial contracts negotiated at arm's length by sophisticated counseled businesspeople." Ashwood Cap., Inc. v. OTD Mgmt., Inc., 99 A.D.3d 1, 7 (N.Y. App. Div. 2012). Therefore, "[a] broad merger clause" stating that the "agreement 'constitutes the full and entire understanding and agreement among the Parties,'" "as a matter of law bars any claim based on an alleged intent that the parties failed to express in writing." Id. at 9 (alterations omitted). The Agreements unambiguously state that Cablevision was not obligated to provide any particular amount of Contract Work to Nationwide and, contrary to Nationwide's assertion that Cablevision did not "ha[ve] the right to provide Nationwide with no work at all," Cablevision had the unconditional right to terminate the Agreements at any time. In light of the broad merger clause included in the Agreements, the plain meaning of the foregoing terms cannot be altered by the allegation that Cablevision encouraged Nationwide to hire more employees and purchase more vehicles with the promise of more Contract Work. See Daiichi Seihan USA v. Infinity USA, Inc., 625 N.Y.S.2d 527, 528

(App. Div. 1995) ("In light of the unambiguous contract[,] . . . [a]ny attempt by defendant to alter the plain meaning of the contract by alleged oral modifications fails as a result of the contract's integration clause.") (citation omitted). Accordingly, Nationwide's breach of contract claim is dismissed insofar as it is based upon Cablevision's alleged oral promise to provide Nationwide with more Contract Work.

3. Implied Covenant of Good Faith and Fair Dealing

Nationwide argues that Cablevision also breached the implied covenant of good faith and fair dealing implicit in the Agreements. Pl. Memo. at 6-7; Compl. at ¶ 114; see also Transeo S.A.R.L. v. Bessemer Venture Partners VI L.P., --- F. Supp.2d ---, 2013 WL 1285453, at *20 (S.D.N.Y. Mar. 29, 2013) ("Under New York law, implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance.") (internal quotation marks and alteration omitted). "New York considers breach of the implied duty of good faith merely a breach of the underlying contract," and "[u]nless the claim for breach of the implied covenant is based on allegations different than those underlying the accompanying breach of contract claim, two distinct causes of action cannot be maintained." Hallmark Aviation Ltd. v. AWAS Aviation Servs., Inc., No. 12 Civ. 7688, 2013 WL 1809721, at *4 (S.D.N.Y. Apr. 30, 2013) (internal quotation marks and citation omitted); see also Harris v. Provident Life and Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled."); Transeo, 2013 WL 1285453, at *20 ("[A] claim alleging a breach of this covenant will not stand if it is duplicative of a breach of contract claim."). Therefore, "a cause of action for breach of the implied covenant should be dismissed as duplicative if it arises from the same facts and seeks the same damages as a breach of contract

claim." Hallmark, 2013 WL 1809721, at *4; see also Gun Hill Road Serv. Station, Inc. v. ExxonMobil Oil Corp., No. 08 Civ. 7956, 2013 WL 395096, at *8 (S.D.N.Y. Feb. 1, 2013) ("The implied covenant of good faith and fair dealing does not modify the[] express terms of the contract.").

Here, Nationwide has failed to allege facts in support of the breach of implied covenant claim that are distinct from the allegations underlying the breach of contract claim, and the damages sought for both claims are the same. Moreover, as discussed in further detail below, infra § II.I., Nationwide has failed to allege facts showing that in terminating the Agreements Cablevision acted "'arbitrarily, irrationally or in bad faith,'" rather than in its own self-interest. Gun Hill, 2013 WL 395096, at *8 (quoting Sveaas v. Christie's Inc., 452 F. App'x 63, 66 (2d Cir. 2011)); see also Suthers v. Amgen Inc., 441 F. Supp.2d 478, 485 (S.D.N.Y. 2006) ("Plaintiffs have no support for the broad proposition that an entity violates the implied covenant of good faith and fair dealing by acting in its own self-interest consistent with its rights under a contract."). Therefore, Nationwide's claim of breach of the implied covenant of good faith and fair dealing is duplicative of the breach of contract claim and is dismissed.

4. Defendant's Motion for a More Definitive Statement

Cablevision has not moved to dismiss Nationwide's breach of contract claim as it relates to the equipment charges and the withholding of remittances owed for Contract Work performed. [Docket Entry No. 13-8] at 4. However, Cablevision has requested a more definite statement pursuant to Rule 12(e) of the Federal Rules of Civil Procedure with respect to the allegedly fraudulent equipment charges. Id.

Rule 12(e) allows a party to move for a more definite statement of a pleading "which is so vague or ambiguous that the party cannot reasonably prepare a response" and requires the

moving party to "point out the defects complained of and the details desired." FED. R. CIV. P. 12(e). Motions for a more definite statement "should not be granted unless the complaint is so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it. The Rule is designed to remedy unintelligible pleadings, not to correct for lack of detail." Leviton Mfg. Co., Inc. v. Reeve, --- F. Supp.2d --- , 2013 WL 504020, at *21 (E.D.N.Y. Feb. 7, 2013) (internal quotation marks omitted). Nationwide's allegations with respect to the equipment charges are intelligible, and Cablevision has not specified the clarification desired or the prejudice that would result from responding to the allegations. Therefore, Cablevision's motion for a more definite statement pursuant to Rule 12(e) is denied.

### B.    Unfair and Deceptive Trade Practices

Sections 349 and 350 of the New York General Business Law prohibit "[d]eceptive acts or practices" and "[f]alse advertising" "in the conduct of any business." N.Y. GEN. BUS. LAW §§ 349(a), 350.   To state a cause of action under either section, "'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 941 (2012) (quoting City of N.Y. v. Smokes-Spirits.Com, Inc., 12 N.Y.3d 616, 621 (2009)).[7]  To be actionable, "[w]hether a representation or an omission, the deceptive practice must be likely to mislead a reasonable consumer acting reasonably under the circumstances." Stutman v. Chemical Bank, 95 N.Y.2d 24, 29 (2000)

---

[7]    "[Section] 350 [also] requires—unlike § 349—that the plaintiff must demonstrate reliance on the allegedly false advertising." Leider v. Ralfe, 387 F. Supp.2d 283, 292 (S.D.N.Y. 2005) (citing Small v. Lorillard Tobacco Co., Inc., 679 N.Y.S.2d 593, 599 (App. Div. 1998), aff'd, 698 N.Y.S.2d 615 (1999)).

(internal quotation marks omitted); see also Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, 85 N.Y.2d 20, 26 (1995) (applying an "objective definition of deceptive acts and practices, whether representations or omissions, limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances . . . , which may be determined as a matter of law or fact (as individual cases require)"); Leider v. Ralfe, 387 F. Supp.2d 283, 292 (S.D.N.Y. 2005) ("[A] violation of either section [349 or 350] requires that the defendant's conduct deceive a reasonable consumer in a material respect, work a harm to the public at large, and directly cause the plaintiff's injury.").

Nationwide asserts that Cablevision "mislead [sic] the consuming public by issuing a public statement that [Cablevision] was 'immediately suspending work with the Nationwide subcontracting company, which provides a limited amount of work, only in Suffolk County, NY, pending a complete and thorough investigation,'[8] without also disclosing" that: (1) Nationwide was Cablevision's "top-performing contractor"; (2) Cablevision "had specifically authorized Nationwide to permit Sanchez to perform [Contract] Work even after Sanchez had been accused of stealing from a Cablevision customer"; (3) "Cablevision's own background check of Sanchez even after his arrest was benign"; and (4) "some of the alleged burglaries occurred in homes serviced by Cablevision employees." Compl. at ¶ 118. Although Nationwide acknowledges that the Statement is not false or misleading on its face, as Cablevision did in fact suspend its relationship with Nationwide pending an investigation following Sanchez's arrest, it argues that the Statement "impl[ied] that Cablevision 'had effectively eliminated the risk of burglaries by

---

[8]      Nationwide omitted the first clause of the statement from its complaint. Cablevision's full statement was: "We are cooperating fully with the police and are immediately suspending work with the Nationwide subcontracting company, which provides a limited amount of work only in Suffolk County, New York, pending a complete review and th[o]rough investigation." Declaration of Sean Thomas Keely in Support of Defendants' Motion to Dismiss ("Keely Aff.") Ex. B.

cable technicians bearing its marks and logos on their vehicles and uniforms by terminating its contract with Nationwide,' when in fact Nationwide had nothing to do with the thefts and the termination of Nationwide did nothing to protect the consumers who were the intended audience for Cablevision's false claim." Pl. Memo. at 9.

The Court agrees with Cablevision that Nationwide's "speculation about what consumers inferred from what the Statement did not say is mere conjecture, insufficient to survive a motion to dismiss." Def. Memo. at 9-10. Cablevision made clear clear that it was conducting an investigation and did not claim to have provided all relevant information concerning the burglaries. See Gomez-Jimenez v. N.Y. Law School, 956 N.Y.S.2d 54, 59 (App. Div. 2012) ("[A] party does not violate [section 349] by simply publishing truthful information and allowing consumers to make their own assumptions about the nature of the information."); Andre Strishak & Assocs., P.C. v. Hewlett Packard Co., 752 N.Y.S.2d 400, 403 (App. Div. 2002) (holding that the section 349 claim was properly dismissed where the defendant represented that ink cartridges were included with the purchase of its printers but did not disclose that the cartridges were economy-size). "In the case of omissions . . . [section 349] does not require businesses to ascertain consumers' individual needs and guarantee that each consumer has all relevant information specific to its situation," but omissions may be actionable "where the business alone possesses material information that is relevant to the consumer and fails to provide this information." Oswego, 85 N.Y.2d at 26. The information that allegedly should have been included in the Statement was known to Nationwide, and Nationwide was free to publicize that information if it believed that it was relevant to consumers or would mitigate the damage to its reputation.[9] Cf. Bildstein v. MasterCard Int'l, Inc., No. 03 Civ. 9826I, 2005 WL 1324972, at *4

---

[9]     Nationwide's assertion that "Cablevision was in fact in exclusive possession of the

(S.D.N.Y. June 6, 2005) (holding that the plaintiff sufficiently pleaded deception by omission where the defendant allegedly "went to great efforts to conceal" the existence of a consumer fee) (internal quotation marks omitted). Therefore, the alleged omissions cannot form the basis for a deceptive practices claim.

Moreover, even if the Statement was misleading, Nationwide has failed to allege that it harmed consumers or the public interest in any way. "[T]he gravamen of the [section349] complaint must be consumer injury or harm to the public interest[,] . . . whether the suit is brought by a consumer or a competitor." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995) (internal quotation marks omitted); see also Gucci Am., Inc. v. Duty Free Apparel, Ltd., 277 F. Supp.2d 269, 273 (S.D.N.Y. 2003) ("Commercial claimants under § 349 must allege conduct that has significant ramifications for the public at large in order to properly state a claim.") (internal quotation marks omitted). Here, although Nationwide asserts that consumers were harmed by the Statement's false implication that Cablevision had "eliminated the risk of burglaries by cable technicians bearing its marks and logos," Pl. Memo. at 9, "allegations of consumer confusion are generally not sufficient consumer harm to state a section 349 claim," Stadt v. Fox News Network LLC, 719 F. Supp.2d 312, 323-24 (S.D.N.Y. 2010) (holding that the plaintiff's allegation that the defendant's false representation regarding the origin of a video failed to adequately allege harm to consumers or the public interest), and Nationwide has failed to allege how the purportedly false implications of the Statement caused any actual injury to consumers. See Levine v. Landy, 832 F. Supp.2d 176, 192 (N.D.N.Y. 2011)

---

information that all but one of the allegedly burglarized customers had not been serviced by Nationwide" is without merit, since Nationwide was clearly able to determine whether its employees had serviced certain customers. Moreover, whether or not the customers were in fact serviced by Nationwide is irrelevant given that Sanchez, an employee of Nationwide, was charged with the burglaries.

(holding that allegation that the defendants confused consumers regarding the authorship of the plaintiff's photographs failed to adequately allege consumer harm); LBB Corp. v. Lucas Distrib., Inc., No. 08 Civ. 4320, 2008 WL 2743751, at *3 (S.D.N.Y. July 14, 2008) (holding that allegation of "actual confusion amongst consumers whereby the public is deceived and confused into believing that the Defendants' film is produced, provided, endorsed or authorized by Plaintiff" failed to adequately allege harm to consumers or the public interest).

For the foregoing reasons, Nationwide's claim asserted pursuant to New York General Business Law §§ 349 and 350 (Count II) is dismissed.[10]

C.     Unfair Competition

"The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of [the] plaintiff's labors and expenditures by obtaining access to [the] plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship. . . . [U]nfair competition is a broad and flexible doctrine that depends more upon the facts set forth than in most causes of action. It has been broadly described as encompassing any form of commercial immorality, or simply as endeavoring to reap where one has not sown; it is taking the skill, expenditures and labors of a competitor, and misappropriating for the commercial advantage of one person a benefit or property right belonging to another." Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 197-98 (2d Cir. 2001) (internal quotation marks and alterations omitted); see also Coca-Cola N. Am. v. Crawley Juice, Inc., No. 09-CV-3259, 2011 WL 1882845, at *6 (E.D.N.Y. May 17, 2011). "While there is no complete list of

---

[10]     Given the disposition of this claim, it is not necessary for the Court to determine whether Nationwide adequately alleged "consumer-oriented" conduct by Cablevision. See Koch, 18 N.Y.3d at 941; Sheth v. N.Y. Life Ins. Co., 709 N.Y.S.2d 74, 75 (App. Div. 2000) ("[T]he requirement that the challenged conduct be 'consumer-oriented' may be met by a showing that the practice has a broader impact on the consumer at large.").

19

activities which constitute unfair competition under New York law," Bongo Apparel, Inc. v. Iconix Brand Grp., Inc., No. 601903/06, 2008 WL 41341 (N.Y. Sup. Ct. Jan. 2, 2008), "[t]he tort is not all-encompassing," and "[t]he New York Court of Appeals in rejecting the notion that unfair competition is equivalent to the amorphous term 'commercial unfairness' has stated that misappropriation of another's commercial advantage is a cornerstone of the tort." CA, Inc. v. Simple.com, Inc., 621 F. Supp.2d 45, 53 (E.D.N.Y. 2009) (internal quotation marks omitted); MiniFrame Ltd. v. Microsoft Corp., No. 11 Civ. 7419, 2013 WL 1385704, at *8 (S.D.N.Y. Mar. 28, 2013) ("Under New York law, the gravamen of an unfair competition claim is the bad faith misappropriation of a competitor's commercial advantage.").

Nationwide alleges that Cablevision engaged in unfair competition by: (1) misappropriating Nationwide's "confidential and proprietary information regarding its employees for the undisclosed purpose of soliciting those employees to work for Cablevision and/or AWS" and "contact[ing] Nationwide's employees and inform[ing] them that Nationwide 'is no more,' and that their only option for continuing to perform work for Cablevision in Suffolk County would be to accept employment with AWS," Compl. at ¶¶ 73, 127; and (2) requiring, "[p]ursuant to [the Agreements]," Nationwide employees performing Contract Work to "wear uniforms and badges and to affix magnetic signs to their vehicles prominently featuring Cablevision's 'Optimum' service mark, with no reference to . . . Nationwide," Compl. at ¶¶ 39, 125.[11]

"[L]egal conclusions . . . must be supported by factual allegations," Iqbal, 556 U.S. at

---

[11]     Nationwide also alleges that the Statement constituted unfair competition, as it "caused or is likely to cause Cablevision's own activities to be mistaken for Nationwide's activities in the mind of the public." Compl. at ¶ 126. As discussed with respect to plaintiff's deceptive trade practices claim, supra, § III.B., the Statement was not false or misleading and therefore cannot support a claim of unfair competition.

678, and therefore Nationwide's unsupported conclusion that the identities of its employees were "confidential and proprietary" is not sufficient to withstand a motion to dismiss. See Def. Memo. at 17 ("Nationwide cannot rely on the conclusory allegation that 'confidential and proprietary information' was 'misappropriated.'"). Nationwide's argument, relying upon Astroworks, Inc. v. Astroexhibit, Inc., 257 F. Supp.2d 609, 619 (S.D.N.Y. 2003), that a "bare allegation that defendant exploited 'confidential and proprietary' information sufficiently pled a claim of unfair competition, even where defendant disputed that such information was proprietary," is without merit. Pl. Memo. at 16. In Astroworks, the plaintiff alleged that he approached the defendant with his idea for a "virtual exhibit hall and online database that would sell space-related products and services" and that after joint efforts to develop the venture the defendant "obtain[ed] a copyright on the website, effectively co-opting [the plaintiff's] idea." 257 F. Supp.2d at 612-13. Such allegations clearly state a plausible claim that "the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." Telecom, 280 F.3d at 197. Here, the allegation that Cablevision induced Nationwide's employees to work for AWS alone does not state a plausible claim of unfair competition, since "the mere inducement of an at-will employee to join a competitor [is not] actionable, unless dishonest means are employed, or the solicitation is part of a scheme designed solely to produce damage." Headquarters Buick-Nissan v. Michael Oldsmobile, 539 N.Y.S.2d 355, 355 (App. Div. 1989) (citing Coleman & Morris v. Pisciotta, 107 N.Y.S.2d 716 (N.Y. App. Div. 1951) ("We may not assume that the employment relationships were other than at will and, in our opinion, mere inducement to an employee at will to discontinue such employment is not actionable[,] at least unless the purpose of the actor was solely to produce damage, or unless the

21

means employed were dishonest or unfair.")). As discussed below, Nationwide's allegations do not support the conclusion that Cablevision was motivated "solely to produce damage," Coleman, 107 N.Y.S.2d at 716, and Nationwide has failed to allege how Cablevision's solicitation of its employees was otherwise dishonest or unfair. Cablevision's statement to the employees that "their only option for continuing to perform work for Cablevision in Suffolk County would be to accept employment with AWS" was not false given Cablevision's termination of its relationship with Nationwide. Moreover, the section of the Agreements addressing confidentiality of proprietary information does not include the identities of Nationwide's employees, see 2011 Agreement § 7; 2006 Agreement § 7, and Nationwide has offered no other reason that the information should be considered proprietary.

The Court also agrees with Cablevision that the allegations regarding Nationwide's required use of the Optimum service mark "cannot support a claim because they are contrary to the very Agreement on which Nationwide relies." Def. Memo. at 13 n.2. The Agreements provided that "[a]ll Contractor vehicles shall prominently display a Cablevision sign which sign will be provided by Cablevision," and that "[a]ll Contractor vehicles must also have Contractor's name and address prominently displayed." Agreements § 4(l). Nationwide cannot complain of confusion caused by its failure to prominently display its name on its vehicles. See Def. Memo. at 13 n.2.[12]

Nationwide argues that even if the Agreements preclude an unfair competition claim related to the vehicle signage, the claim should nonetheless survive upon the basis of the allegation that Nationwide employees were forced to wear badges and uniforms displaying the

---

[12]     Nationwide's argument in response, that "Cablevision provides no evidence that this requirement was retained in the 2011 Agreement," Pl. Memo. at 14 n.5, is rejected for the same reasons discussed supra § III.B.

22

Optimum sign without mention of Nationwide. See Pl. Memo. at 14 n.5. However, Nationwide fails to explain how the alleged consumer confusion caused by the Optimum service mark on the employees' badges and uniforms caused the injuries complained of here. Nationwide states in conclusory fashion that Cablevision's "deceptive acts and practices" caused Nationwide to "sustain[] economic losses." Compl. at ¶ 130. Insofar as Nationwide is alleging injuries separate and apart from the injuries sustained as a result of the burglaries and Cablevision's termination of the Agreement, this conclusory allegation is insufficient to survive a motion to dismiss.

Although the issue was not raised by Cablevision, the Court also notes that the Agreements provided that Nationwide employees must wear uniforms and badges approved by Cablevision, see 2006 Agreement § 12(j); 2011 Agreement § 13(i), and it is not clear how conduct by Cablevision permitted under the contract can constitute "fraud or deception, or an abuse of a fiduciary or confidential relationship." Telecom, 280 F.3d at 197.

For the foregoing reasons, Nationwide's unfair competition claim (Count III) is dismissed.[13]

D.    Lanham Act

Nationwide alleges that the Statement violated section 43(a) of the Lanham Act, Compl. at ¶¶ 134-136, which "'proscribes false designations of origin or false or misleading descriptions of fact in connection with any goods in commerce that are likely to cause confusion or that misrepresent the nature, characteristics, qualities, or geographic origin of the goods.'" S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001) (quoting Groden v.

---

[13]    Given the disposition of this claim, it is not necessary for the Court to address Cablevision's argument that it and Nationwide are not competitors. Def. Memo. at 14-15. See EMI Music Mktg. v. Avatar Records, Inc., 317 F. Supp.2d 412, 423 (S.D.N.Y. 2004) ("[B]y definition, competition is fundamental to any unfair competition claim. Where there is no competition, there can be no unfair competition.").

Random House, Inc., 61 F.3d 1045, 1051 (2d Cir. 1995)); 15 U.S.C. § 1125(a)(1)(B). In order to prevail on such a false advertising claim, "'a plaintiff must prove the following elements: 1) the defendant has made a false or misleading statement; 2) the false or misleading statement has actually deceived or has the capacity to deceive a substantial portion of the intended audience; 3) the deception is material in that it is likely to influence purchasing decisions; 4) there is a likelihood of injury to plaintiff, such as declining sales or loss of goodwill; and 5) the goods traveled in interstate commerce.'" Conte v. Newsday, Inc., No. 06-CV-4859, 2013 WL 978711, at *10 (E.D.N.Y. Mar. 13, 2013) (quoting Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp., 348 F. Supp.2d 165, 177-78 (S.D.N.Y. 2004)); see also S.C. Johnson, 241 F.3d at 238 ("'The Lanham Act does not prohibit false statements generally. It prohibits only false or misleading descriptions or false or misleading representations of fact made about one's own or another's goods or services.'") (quoting Groden, 61 F.3d at 1052). To demonstrate that the challenged statement is false, a plaintiff may show that (1) "the challenged advertisement is literally false, i.e., false on its face," in which case "consumer deception is presumed, and the court may grant relief without reference to the advertisement's actual impact on the buying public," or (2) the challenged "advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007) (internal quotation marks and alterations omitted).

As explained above, see supra § III.B., the Statement was not literally false and was not otherwise likely to materially mislead or confuse customers. Nationwide's speculation as to consumers' possible interpretation of the Statement also fails to adequately allege that the Statement was likely to affect consumers' purchasing decisions or to cause actual consumer harm. See S.C. Johnson, 241 F.3d at 238 ("[I]n addition to proving falsity, the plaintiff must also

24

show that the defendants misrepresented an inherent quality or characteristic of the product. This requirement is essentially one of materiality . . . .") (internal quotation marks omitted).

Moreover, even if the Statement was false or materially misleading, it is not "commercial advertising or promotion" addressed by the Lanham Act. 15 U.S.C. § 1125(a)(1)(B). In order to qualify as "commercial advertising or promotion," the Second Circuit requires that the representation be (1) commercial speech, (2) for the purpose of influencing consumers to buy defendant's goods or services, and (3) disseminated sufficiently to the relevant purchasing public. Fashion Boutique of Short Hills, Inc. v. Fendi USA, 314 F.3d 48, 57-58 (2d Cir. 2002) (adopting, in part, the test prescribed in Gordon & Breach Science Publishers S.A. v. Am. Institute of Physics, 859 F. Supp. 1521, 1535-36 (S.D.N.Y. 1994)).[14] The Second Circuit further stated that "the touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement. Thus, businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action." Id. at 57.

Nationwide relies upon Fashion Boutique in arguing that the Statement, although not "traditional advertising," is nonetheless subject to the Lanham Act because it was "'disseminated sufficiently to the relevant purchasing public.'" Pl. Memo. at 17-18 (quoting Fashion Boutique, 314 F.3d at 56). While the public dissemination of a statement is a "normal concomitant" of commercial advertising and promotion, it is not sufficient to support a determination that the

---

[14]     The Second Circuit declined to determine whether it is necessary that the representation be made by a defendant who is in commercial competition with the plaintiff, a fourth requirement imposed in Gordon & Breach. See Fashion Boutique, 314 F.3d at 58.

Lanham Act applies. The Lanham Act "does not have boundless application as a remedy for unfair trade practices but is limited to false advertising as that term is generally understood." Alfred Dunhill Ltd. v. Interstate Cigar Co., Inc., 499 F.2d 232, 237 (2d Cir. 1974). The Statement was "not part of an organized campaign to penetrate the relevant market" but was rather, at most, an "isolated disparaging statement[]," id. at 57, and therefore did not constitute commercial advertising and promotion actionable under the Lanham Act.

For the foregoing reasons, Nationwide's Lanham Act claim (Count IV) is dismissed.

E.     Negligence

"To establish a prima facie case of negligence under New York law, 'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" Lerner v. Fleet Bank, N.A., 459 F.3d 273, 286 (2d Cir. 2006) (quoting Solomon v. City of N.Y., 66 N.Y.2d 1026, 1027 (1985)). Nationwide asserts that Cablevision was negligent in (1) "fail[ing] to exercise reasonable care in its public statements about Nationwide relating to the alleged thefts of Cablevision customers' property," and (2) "charging Nationwide for assets which Cablevision knew, or should have known, were not missing, and were not Nationwide's responsibility." Compl. at ¶¶ 144, 146. Cablevision argues that Nationwide has failed to state a negligence cause of action because, inter alia, it has failed to allege the existence of a duty of care owed by Cablevision to Nationwide with respect to either the Statement or the equipment charges. Def. Memo. at 18-19.

The complaint makes the conclusory allegation that Cablevision "undertook a duty to exercise reasonable care in its public statements about Nationwide relating to the alleged thefts of Cablevision customers' property." Compl. at ¶ 143. According to Nationwide, "[a]lthough defendants may dispute that they undertook such a duty, the Verified Complaint claims that they

26

did and defendants provide no legal authority for the proposition that they could not have undertaken such a duty as a matter of law." Pl. Memo. at 18. Therefore "[a] question of fact . . . exists as to whether defendants undertook the duty of care alleged in the complaint, thereby precluding dismissal of the claim on the pleadings." Id.

Nationwide may not rely upon an unsupported legal conclusion in asserting the existence of a duty of care; rather, it must make factual allegation which, if true, demonstrate the existence of such a duty. See In re Lehman Bros. Sec. & ERISA Litig., No. 09 MD 2017, 2012 WL 6000575, at *4 (S.D.N.Y. Dec. 3, 2012) ("[T]he complaint fails to allege facts which, if true, would demonstrate the existence of a legal duty on the part of [the defendant] . . . ."); Iqbal, 556 U.S. at 678 ("[L]egal conclusions . . . must be supported by factual allegations."). Nationwide has failed to allege any facts that support the assertion that Cablevision undertook a duty related to its public statements. Furthermore, even if Cablevision did owe Nationwide a duty of care with respect to its public statements, plaintiff has failed to allege that the Statement breached that duty because, as discussed above, the Statement was not misleading. Therefore, Nationwide has failed to state a cognizable negligence claim upon the basis of the Statement.

Nationwide argues that Cablevision may be subject to tort liability for negligent performance of its contractual obligations related to the equipment charges and relies upon Anunziatta v. Orkin Exterminating Co., Inc., where the court held that a pest control company servicing a homeowner "has a duty to use reasonable care sounding in tort" independent of its contractual duties. 180 F. Supp.2d 353, 359 (N.D.N.Y. 2001).

A duty of care independent of the defendant's contractual obligations has been applied to "[p]rofessionals, common carriers and bailees" where there is a significant "public interest" in the defendant's adequate performance under the contract and the defendant's failure to act with

27

due care could have "catastrophic consequences." <u>Sommer v. Fed. Signal Corp.</u>, 583 N.Y.S.2d 957, 961-62 (1992) (holding that a fire alarm company owed a duty of care upon the basis that, <u>inter alia</u>, its services implicated a significant public interest and the injury complained of was an "abrupt, cataclysmic occurrence"). However, where "sophisticated parties" have "entered into a commercial contract defining their respective duties" and there is no implications for "'the protection of the personal safety of citizens,'" there is no basis to impose a duty of care on the defendant independent of its contractual obligations. <u>THC Holdings Corp. v. Tishman</u>, Nos. 93 Civ. 5393, 95 Civ. 4422, 1998 WL 305639, at *4 (S.D.N.Y. June 9, 1998) (quoting <u>N.Y. Univ. v. Continental Ins. Co.</u>, 639 N.Y.S.2d 283, 288 (1995)). Here, Nationwide and Cablevision are sophisticated parties that entered into an arm's-length commercial contract, the adequacy of Cablevision's performance of its obligations with respect to the equipment charges does not substantially implicate the public interest, and the injury attributed to Cablevision's negligence is identical to the injury caused by the alleged breach of the Agreements. <u>See</u> <u>Millennium Partners, L.P. v. U.S. Bank Nat'l Ass'n</u>, No. 12 Civ. 7581, 2013 WL 1655990, at *5 (S.D.N.Y. Apr. 17, 2013) ("Since the nature of Plaintiffs' injury and the resulting harm caused by the alleged breach of Defendants' tort duty are identical to the injury and harm caused by the alleged breach of contract, the negligence claim must be dismissed as duplicative of the contract claim.") (internal quotation marks and alterations omitted). "[M]erely alleging that the breach of contract duty arose from a lack of due care will not transform a simple breach of contract into a tort." <u>Sommer</u>, 583 N.Y.S.2d at 961. Therefore, plaintiff's negligence claim based upon the equipment charges is duplicative of the breach of contract claim and must be dismissed.

For the foregoing reasons, Nationwide's negligence claim (Count V) is dismissed.

F.    Breach of Fiduciary Duty

To establish a breach of fiduciary duty under New York law, a plaintiff must show:
(1) the existence of a fiduciary duty; (2) a knowing breach of that duty; and (3) damages
resulting therefrom. Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011).
Nationwide alleges that the relationship between it and Cablevision went "beyond a
'conventional business relationship,'" Pl. Memo. at 20, because Nationwide was "required . . . to
place its trust and confidence in Cablevision with respect to the accuracy and reliability of
Cablevision's internal systems for tracking and locating the serialized and non-serialized assets
for which Cablevision took deductions against Nationwide's invoices." Compl. at ¶ 150 (citing
Daly v. Metro. Life Ins. Co., 782 N.Y.S.2d 530, 530 (N.Y. Sup. Ct. 1992) ("[A] fiduciary duty
arises, even in a commercial transaction, where one party reposed trust and confidence in another
who exercises discretionary functions for the party's benefit or possesses superior expertise on
which the party relied.") (internal quotation marks omitted)). According to Nationwide,
Cablevision "breached its fiduciary duties . . . by charging Nationwide for assets which
Cablevision knew or should have known were not being accurately or reliably tracked by
Cablevision's internal systems." Compl. at ¶ 152. Cablevision argues that Nationwide has failed
to allege facts demonstrating the existence of a fiduciary relationship and that the breach of
fiduciary duty claim is duplicative of plaintiff's breach of contract claim. Def. Memo. at 20-21.

Nationwide's conclusory allegation that it placed its trust and confidence in Cablevision
is insufficient to survive a motion to dismiss the breach of fiduciary duty claim. Nationwide has
offered no factual or legal justification for its purported reliance upon Cablevision in keeping
track of Cablevision's equipment in Nationwide's possession and has failed to allege facts
showing that its relationship with Cablevision was anything more than a conventional business

29

relationship. LaRoss Partners, LLC v. Contact 911 Inc., 874 F. Supp.2d 147, 167 (E.D.N.Y. 2012) ("A conventional business relationship, without more, does not become a fiduciary relationship by mere allegation.") (internal quotation marks omitted); KSW Mech. Servs., Inc. v. Mech. Contractors Ass'n of N.Y., Inc., No. 11 Civ. 5100, 2012 WL 1027354, at *6 (S.D.N.Y. Mar. 27, 2012) (same). Moreover, Cablevision has demonstrated that the parties' duties with respect to the equipment were governed by the Agreements, see Def. Rep. at 16, and therefore the allegations forming the basis for plaintiff's fiduciary duty claim are duplicative of those forming the basis for the breach of contract claim. See, e.g., Barbagallo v. Marcum LLP, No. 11-CV-1358, 2012 WL 1664238, at *10 (E.D.N.Y. May 11, 2012) ("[E]ven if [the defendant] owed [the plaintiff] a fiduciary duty of good faith and loyalty, [the plaintiff] has failed to allege sufficient facts to show that he did more than violate the duties he owed under the contract."); Robin Bay Assocs., LLC v. Merrill Lynch & Co., No. 07 Civ. 376, 2008 WL 2275902, at *3 (S.D.N.Y. June 3, 2008) (holding that it "is sufficient to dismiss [the p]laintiff's claim for fiduciary duty" where "there is almost total overlap between [the p]laintiff's claims for breach of contract and fiduciary duty"). Accordingly, Nationwide's breach of fiduciary duty claim (Count VI) is dismissed.

G.    Unjust Enrichment

"Under New York law, for a plaintiff to prevail on a claim of unjust enrichment, he [or she] must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Golden Pacific Bancorp v. F.D.I.C., 273 F.3d 509, 519 (2d Cir. 2001). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'" Kaye v. Grossman, 202 F.3d 611, 616

(2d Cir. 2000) (quoting <u>City of Syracuse v. R.A.C. Holding, Inc.</u>, 685 N.Y.S.2d 381, 381 (App. Div. 1999)). "The term 'unjust enrichment' does not signify a single well-defined cause of action. An action for unjust enrichment is a claim in equity that the result or effect of a failure to make restitution of or for benefits received under the circumstances give rise to a legal or equitable obligation to account for the benefits." <u>Mitchell v. Faulkner</u>, No. 10-CV-8173, 2013 WL 150254, at *7 (S.D.N.Y. Jan. 15, 2013).

Cablevision argues that Nationwide's unjust enrichment claim is precluded by the existence of a valid and enforceable contract between the parties. Def. Memo. at 22; <u>see</u> <u>IDT Corp. v. Morgan Stanley Dean Witter & Co.</u>, 12 N.Y.3d 132, 142 (2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."). Nationwide does not dispute that an enforceable contract precludes a claim of unjust enrichment but asserts that unjust enrichment may be raised as an alternative theory of recovery because Cablevision is contesting the validity of the 2011 Agreement. However, Cablevision has conceded for purposes of the motion that the 2011 Agreement was in effect, and even if the 2011 Agreement was never executed, the 2006 Agreement would have remained in effect. Accordingly, Nationwide's unjust enrichment claim (Count VII) is dismissed.

H.     Civil Conspiracy

Nationwide alleges that "Cablevision conspired with Nationwide's competitor, AWS, to commit torts against Nationwide . . . ." Compl. at ¶ 163. To plead a claim for civil conspiracy, a party must allege an underlying tort, plus: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." <u>Ebusinessware, Inc. v.</u>

31

Tech. Servs. Grp., No. 08 Civ. 9101, 2009 WL 5179535, at *15 (S.D.N.Y. Dec. 29, 2009) (internal quotation marks omitted); see also Cofacredit v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 240 (2d Cir. 1999) ("To prove a conspiracy, a plaintiff must show a corrupt agreement, an overt act in furtherance of that agreement, and membership in the conspiracy by each defendant."). The purpose of a civil conspiracy claim is to "connect the actions of separate defendants with an otherwise actionable tort." Alexander & Alexander of N.Y., Inc. v. Fritzen, 68 N.Y.2d 968, 969 (1986).

AWS is not a defendant in this action, and Nationwide has asserted the underlying tort claims against Cablevision directly. Therefore, Nationwide is asserting an independent conspiracy cause of action, which is not permitted under New York law. Steier v. Schreiber, 810 N.Y.S.2d 431, 434 (App. Div. 2006) ("New York does not recognize civil conspiracy to commit a tort as an independent cause of action."); see also Danahy v. Meese, 84 A.D.2d 670, 672 (N.Y. App. Div. 1981) ("[I]f the conspiracy causes of action are allowed, plaintiff, having recovered on the substantive tort, would then be permitted a duplicative recovery on the conspiracy causes of action with the proof of nothing additional other than the agreement."). Accordingly, Nationwide's civil conspiracy claim (Count VIII) is dismissed.

I.    Prima Facie Tort

"A cause of action of prima facie tort consists of four elements: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." Garrison v. Toshiba Bus. Solutions (USA), Inc., No. 11-CV-2214, 2012 WL 6025745, at *6 (E.D.N.Y. Dec. 3, 2012) (internal quotation marks omitted). "The touchstone [of a prima facie tort claim] is 'disinterested malevolence,' meaning that the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done

32

with the sole intent to harm." Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 571 (2d Cir. 1990); see also, e.g., Jewel Source, Inc. v. Primus Jewels, LLC, No. 11 Civ. 3941, 2011 WL 4634019, at *3 (S.D.N.Y. Oct. 3, 2011) ("To prevail on [a prima facie tort] claim, [the plaintiff] must allege that [the defendant] acted solely from disinterested malevolence.") (internal quotation marks omitted). Cablevision argues that the prima facie tort claim must be dismissed because, inter alia, Nationwide "cannot and does not plead that Cablevision acted solely to harm Nationwide." Def. Memo. at 24. According to Nationwide, "[a]lthough Cablevision may have had commercial reasons for seeking to minimize the public relations fallout from the burglaries of Cablevision customers by Cablevision installers, there can be no justification for Cablevision's malicious actions, and questions of 'mixed motives' are not fatal to a cause of action for prima facie tort in any event." Pl. Memo. at 23-24.

Nationwide's argument relies upon Burns, Jackson, Miller, Summit & Spitzer v. Lindner, in which the trial court stated that "[t]he critical issue concerning the intent element is not whether the harmful act was solely malicious, to the exclusion of any other purpose, but rather whether it was justified by any legal or social purpose." 437 N.Y.S.2d 895, 902 (N.Y. Sup. Ct. 1981). However, plaintiff failed to recognize and/or point out to the Court that the New York Court of Appeals reversed the trial court's decision, holding that "there is no recovery in prima facie tort unless malevolence is the sole motive for [the] defendant's otherwise lawful act . . . , by which is meant that the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another," and dismissed the prima facie tort claim "because, although [the plaintiffs] allege[d] intentional and malicious action, they [did] not allege that [the] defendants' sole motivation was 'disinterested malevolence.'" 59 N.Y.2d 314, 333 (1983) (emphasis added).

33

Nationwide's own allegations demonstrate that Cablevision had "motives other than disinterested malevolence, such as profit, self-interest, or business advantage." Twin Labs., 900 F.2d at 571 (internal quotation marks omitted). Nationwide alleges that Cablevision's public termination of Nationwide as a contractor was motivated by its desire to protect its reputation by distancing itself from the burglaries, see Compl. at ¶ 57 ("In a deliberate, malicious effort to deceive consumers into concluding that [plaintiff], but not [defendants] was somehow responsible for Sanchez' [sic] criminal conduct, . . . publicly announced that it was 'immediately suspending work with [plaintiff's] subcontracting company . . . .'"), and that the inaccurate equipment charges stemmed from a "double dipping" scheme whereby Cablevision sought to charge its customers and its contractors for the same equipment, see Compl. at ¶ 105 ("[Cablevision] charges its customer and its installation contractor for the same item of equipment, and conceals the double-charging from both parties . . . ."). Such self-interested motivations on behalf of Cablevision are fatal to a prima facie tort claim. See, e.g., Jewel Source, 2011 WL 4634019, at *3 (dismissing the plaintiff's prima facie tort claim where the plaintiff "provided no basis for believing that [the defendant] had a motive specifically to cause [the plaintiff] injury rather than, for example, to turn a profit").[15] Accordingly, Nationwide's

---

[15]     Nationwide also relies upon L/M Ninety CM Corp. v. 2431 Broadway Realty Co., in which the Appellate Division reversed the trial court's dismissal of a prima facie tort claim, holding that "[w]hile [the counterclaim defendants] claim that the conduct complained of could not have arisen solely out of disinterested malevolence since the action arose out of a commercial controversy, the alleged acts in question seem to have been motivated solely by a desire to injure [the counterclaim plaintiffs]," and that the "motivation behind the acts in question is a factual issue for trial precluding the dismissal of the counterclaim." 566 N.Y.S.2d 277 (App. Div. 1991). This case does not support Nationwide's argument that a prima facie tort claim is not precluded by commercial motivations for Cablevision's actions, since the L/M Ninety court held that the counterclaim defendants' alleged actions in that case "seem[ed] to have been motivated solely by a desire to injure [the counterclaim plaintiffs]." Id. (emphasis added). As discussed above, Nationwide's own allegations attribute motivations to Cablevision other than a desire to injure Nationwide.

34

prima facie tort claim (Count IX) is dismissed.

IV.    Conclusion

For the foregoing reasons, Cablevision's motion to dismiss Nationwide's complaint

[Docket Entry No. 13] is GRANTED. Counts II, III, IV, V, VI, VII, VIII, and IX are dismissed

in their entirety, and Count I is dismissed insofar as it is based upon the termination of the

Agreements and the alleged oral promises by Cablevision to provide Nationwide with more

Contract Work.

**SO ORDERED.**

/s/ Sandra J. Feuerstein

SANDRA J. FEUERSTEIN
United States District Judge

Dated: May 7, 2013
       Central Islip, New York